**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHRISTINE GOLD,<br><br>    414 West Mesquite Drive<br>    Cottonwood, AZ 86326<br><br>    *Plaintiff*,<br><br>    v.<br><br>ELISABETH DEVOS, *in her official capacity as Secretary of Education*,<br><br>    400 Maryland Avenue, S.W.<br>    Washington, D.C. 20202<br><br>and<br><br>UNITED STATES DEPARTMENT<br>OF EDUCATION,<br><br>    400 Maryland Avenue, S.W.<br>    Washington, D.C. 20202<br><br>    *Defendants*. | Case No. 18-cv-2706<br><br>**COMPLAINT** |

**INTRODUCTION**

1.      Plaintiff Christine Gold, a former student at the Court Reporting Institute ("CRI"), brings this action against Elisabeth DeVos, in her official capacity as Secretary of Education, and the United States Department of Education (the "Department") (collectively the "Defendants") to assert that the Department has failed to process a borrower defense to repayment claim that Ms. Gold submitted in May 2016 (hereinafter the "Claim"). The Department's failure to process this Claim demonstrates that Defendants have unreasonably delayed final agency action in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1).

2. The Department's inaction with regards to Ms. Gold's Claim is illegal because the Department is aware that Washington state's Workforce Training and Education Coordinating Board (hereinafter the "Workforce Board" or "Board") found that CRI "engaged in a significant number of unfair business practices . . . [by (1)] representing falsely the qualifications of its faculty . . . [, (2)] providing prospective students with information [that] has the tendency to mislead or deceive . . . regarding current practices of the school . . . [, and (3)] making statements in connection with the offering of education that the school knew or reasonably should have known to be false, substantially inaccurate, or misleading."

3. The Department is further aware that these findings relate to a period of time during which Ms. Gold made her initial and ongoing decisions to enroll and remain enrolled in CRI's court reporting program. Ms. Gold is, therefore, among the "[h]undreds of students" that the Workforce Board concluded have "paid thousands of dollars each for a program that they will never complete."

4. Moreover, the Department is aware that the findings and conclusions made by the Workforce Board are final, give rise to a state law cause of action, and cannot be re-litigated due to the doctrine of collateral estoppel.

5. By failing to process Ms. Gold's Claim in a reasonable amount of time, the Department has violated the APA. Ms. Gold therefore seeks a declaratory judgment imposing a deadline on the Department to issue a final decision on her Claim.

**JURISDICTION AND VENUE**

6. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the APA, 5 U.S.C. §§ 701-706, and the Higher Education Act ("HEA"), 20 U.S.C. § 1082. The Court also has jurisdiction to compel an officer or employee of the Department, including the Secretary, to perform his or her duty under 28 U.S.C. § 1361.

7. Because this is an action against an officer and agency of the United States, venue is proper in this district pursuant to 28 U.S.C. § 1391(e). Venue is also proper in this district because the Department resides here and Secretary DeVos performs her official duties here. Finally, many of the events giving rise to this action took place here.

## PARTIES

8. Plaintiff Christine Gold is a natural person who now resides in Cottonwood, Arizona. During her attendance at CRI, Ms. Gold resided in Seattle, Washington.

9. Defendant Elisabeth DeVos is the Secretary of Education of the United States Department of Education ("the Secretary"). She is being sued in her official capacity. The Secretary oversees all operations of the Department and the administration of the federal student loan programs, including the Federal Family Education Loan ("FFEL") and Direct Loan programs. She has the ultimate duty and power to collect, discharge, cancel, settle, or compromise federal student loans. In addition, the Secretary's duties and powers include specifying via regulation when federal student loan borrowers may assert school misconduct as a defense to repayment.

10. Defendant United States Department of Education is a department of the executive branch of the United States government, headquartered in Washington, D.C., and an agency of the United States within the meaning of 5 U.S.C. § 552(f)(1).

## FACTUAL ALLEGATIONS

*Ms. Gold's Enrollment, Continued Enrollment, and Financing of Higher Education at CRI*

11. After her husband acquired a disability, Ms. Gold became the sole breadwinner for her family, which motivated her to find a higher paying job that would allow her family to live comfortably on only one income. In September 2001, Ms. Gold saw an advertisement in the *Seattle Times* that described CRI's court reporting program as a way to make a better living.

Shortly thereafter, she attended a local job fair where she came across a table for CRI. She spoke with CRI's representative and decided to take informational brochures home to review. Ms. Gold then contacted CRI to schedule a meeting with an admissions representative.

12. During that meeting, which took place in October 2001, CRI promised Ms. Gold that she would make $65,000 a year immediately following graduation. The representative also told her that she would get a job right away due to CRI's perfect (*i.e.* 100%) job placement success rate.

13. In addition, the admissions representative told Ms. Gold that the court reporting program could typically be completed in three years or less since it was self-paced, as well as that high-quality, experienced instructors would teach all of her required courses.

14. Around that time, Ms. Gold carefully reviewed written statements made in CRI's 2001 "College Catalog," which took effect on January 1, 2001. The catalog advertised that "the majority of [CRI] graduates" were placed in a job in their field of study. Exhibit A, Part 1, Washington State Attorney General's Office Group Borrower Defense to Repayment Claim on Behalf of CRI Students, at 174. The catalog further represented an eighty-nine percent placement rate for the court reporting day program and a seventy-five percent placement rate for the night program. *Id.* Moreover, the 2001 College Catalog represented a "Retention Rate[]" of seventy-three percent for the court reporting day program and seventy-four percent for the night program. *Id.*

15. As described in this catalog, the court reporting program was 3,000 hours in length. Using this hour requirement as a baseline, the 2001 catalog represented that the day program would take about thirty months to complete, while the evening program would take about forty-five months. Ex. A, Pt. 1 at 151, 164.

16.     The 2001 catalog also described the educational philosophy of CRI as "provid[ing] quality educational programs [that] equip . . . students with the skills necessary for a successful career in today's economy" through "hands-on training by a competent and experienced staff." Ex. A, Pt. 1 at 147.  To help achieve these ends, CRI promoted facilities that included a fully equipped typing and word processing center as well as four complete computer training classrooms. *Id.*

17.     In reliance on both CRI's oral and written representations—made through the admissions representative and the 2001 College Catalog—Ms. Gold decided to enroll at CRI. She began attending in November 2001.

18.     Ms. Gold put in long hours every day at CRI, as well as practiced for three to five hours every night on her own.  She completed every course requirement.  Despite being told by her course instructors that she was making progress, however, Ms. Gold began to realize that she was no closer to graduation and her dream of becoming a successful court reporter.

19.     For that reason, periodically between 2001 and 2005, Ms. Gold considered whether to continue her enrollment at CRI.

20.     Approximately four to six months after her enrollment at CRI, Ms. Gold befriended several other students who appeared to be in a similar situation: working diligently on their course requirements, but no closer to graduation.  After speaking with these students, Ms. Gold grew increasingly anxious and scared that she would never graduate from CRI.

21.     Ms. Gold also worried after she noticed two students who had been admitted to CRI, but who were clearly not qualified to become court reporters.  She met one student who was non-verbal and visually-impaired and had made no progress toward graduation, yet CRI continued to allow her to attend school and pay tuition.  Ms. Gold met another student who disclosed that she had arthritis developing in her hands.  CRI told that student that it would not

be a problem to work as a court reporter with arthritis, even though such a job would require long days filled with hours of typing on her steno machine.

22. Ms. Gold likewise noticed that CRI's Seattle campus had dilapidated furniture and outdated computers and equipment.

23. For months and then years, Ms. Gold resisted the urge to withdraw from CRI. She had invested so much time, effort, and money into the court reporting program and did not want to quit without gaining any new marketable skills. In addition, Ms. Gold stressed about the prospect of having to repay her student loans if she withdrew.

24. During the latter half of 2004, Ms. Gold began scheduling appointments with individuals who held leadership positions at CRI. She would explain her lack of progress to these individuals and ask for help. No assistance was ever provided, however, other than general suggestions to "try harder" and "practice more."

25. Finally, in 2005, nearly three and a half years after starting at CRI, Ms. Gold withdrew without a credential.

26. To finance her education at CRI, Ms. Gold took out several student loans. Ms. Gold's National Student Loan Data System ("NSLDS") information is attached hereto as Exhibit B.

27. In November 2001, Ms. Gold took out her first FFEL loan in the amount of $6,625.

28. In 2002, Ms. Gold took out two additional FFEL loans in the amounts of $4,000 and $2,625.

29. In 2003, Ms. Gold took out two more FFEL loans in the amounts of $3,500 and $4,000.

6

30. Finally, in 2004, Ms. Gold took out four additional FFEL loans in the amounts of $4,000, $3,500, $4,000, and $3,500. For the latter two loans, $3,750 was later cancelled.

31. In total, Ms. Gold borrowed $35,750 in Title IV funds to finance her attendance at CRI.

32. When Ms. Gold first entered repayment, she struggled to make her monthly loan payments. As a result, her student loans have been placed into deferral and forbearance multiple times over the years. The balance continues to grow.

33. In June 2007, Ms. Gold consolidated her nine individual FFEL loans into two FFEL loans in the amounts of $24,497 and $11,349.

34. To date, Ms. Gold currently owes, including interest, approximately $62,148 on her FFEL consolidation loans.

*Misconduct by CRI and the Workforce Board's Factual Findings*

35. The Workforce Board licenses and regulates private career schools doing business in the state of Washington. The Board is required by statute to adopt minimum standards for entities operating as private vocational schools, including assessing whether a private vocational school is eligible to maintain a license in Washington. The Board's governing law is intended to "protect against practices by private vocational schools which are false, deceptive, misleading, or unfair, and to help ensure adequate educational quality at private vocational schools." *See* Wash. Rev. Code § 28C.10.010.

36. The Board is also charged with investigating complaints about vocational schools in Washington, making factual findings, ordering the school to cease and desist any unfair business practices, and providing appropriate relief to students. *See generally* Wash. Rev. Code, Chap. 19.86.

37. In October 1999, in response to student complaints, the Board determined that CRI had misled students regarding the amount of time it would take to complete its court reporting program. Exhibit A, Part 2, Washington State Attorney General's Office Group Borrower Defense to Repayment Claim on Behalf of CRI Students, at 196-99. Indeed, the Board found that, of the 185 students that had enrolled in the night program "since its inception" in 1988, "[j]ust over 10 percent (19 students) of them had graduated at the time of our investigation." *Id.* at 197. The Board stated that:

> The agency finds [that CRI] knew or should have known that for whatever reason, an average student cannot complete the evening court reporting program in three years. In fact, there is some question whether an average student can complete the program at all. We base this conclusion on the fact that only 10 percent of the school's evening students have completed the program and those few who did complete took an average of three and one-half years to do so. While the agency does not expect schools to unreasonably discourage potential students from enrolling[,] it does require schools to provide them with accurate and complete information so they can make informed decisions about whether to enroll. The information provided to potential court reporting students is neither accurate nor complete and is, in fact, misleading. Providing potential students with misleading information is an unfair business practice as described in [Wash. Rev. Code § 28C.10.110(10)].

*Id.* at 198.

38. In December 1999, CRI provided a "response" to the Board's October 1999 findings in which CRI stated that it had undertaken certain reforms to fulfill its obligation to provide students with complete and accurate information. Ex. A, Pt. 2 at 209-10. At that time, CRI also represented to the Board that it had "attempted to be up front with each prospective applicant about the difficulty of completing court reporting." *Id.* at 210.

39. In 2001, however, the Board received new complaints from CRI students alleging that CRI continued to misrepresent the time it would take students to complete its court reporting program. The Board found that CRI continued to advertise a two-and-a-half year program, but

in reality, "the few students who actually completed the program took an average of four years to get through the day program and more than five years to get through the evening program." Exhibit A, Part 3, Washington State Attorney General's Office Group Borrower Defense to Repayment Claim on Behalf of CRI Students, at 22.  For that reason, the Board found that "CRI was misleading students with regard to the actual length of the program and required CRI to disclose to prospective students[] the likelihood that it would take them much longer than 2 ½ years."  *Id.*

40. In 2002, the Board contacted CRI again regarding a complaint it had received alleging misrepresentations to a prospective student about the length of the court reporting program.  At that time, the Board informed CRI that it would reopen its investigation.  Ex. A, Pt. 2 at 235.

41. During this time period, the 2002 School Catalog (effective January 2002) advertised a seventy-five percent placement rate for the court reporting day program and a 100 percent placement rate for the night program.  Ex. A, Pt. 1 at 230.

42. In September 2003, the Board found that the school's employment of a particular teacher "constitute[d] an unfair business practice" because the teacher did not possess the necessary qualifications to teach the subject taught.  Ex. A, Pt. 3 at 4.  The Board and CRI ultimately resolved this finding through a settlement agreement.  *Id.* at 8-15.

43. In 2004, CRI's College Catalog (effective January 2004) advertised a 100 percent placement rate for both the court reporting day and night programs.  Ex. A, Pt. 1 at 289.

44. In June 2005, the Workforce Board found that CRI continued to employ unqualified instructors—in violation of the 2003 settlement agreement—as well as misrepresent the length of its program to prospective students.  Ex. A, Pt. 3 at 22-23.  At that time, the Board determined that CRI's completion rate was six percent for the period July 1, 2000 through June

30, 2003. *Id.* at 23.  Only ten of the 179 students who left CRI's court reporting program during that period actually completed the program. *Id.* The Board further determined that of these ten completers, only three were working in the field six to nine months after graduation. *Id.*

45. Based on these findings, as well as others, the Board concluded that CRI "engaged in a significant number of unfair business practices by failing to comply with the terms of a student contract (which incorporates the school's catalog by reference) [Wash. Rev. Code § 28C.10.110(1)], representing falsely the qualifications of its faculty [*id.* § 28C.10.110(6)], providing prospective students with information [that] has the tendency to mislead or deceive prospective students regarding current practices of the school [*id.* § 28C.10.110(8),] and making statements in connection with the offering of education that the school knew or reasonably should have known to be false, substantially inaccurate, or misleading [*id.* § 28C.10.110(10)]." Ex. A, Pt. 3 at 23.

46. The 2005 catalog, which was in effect the year that Ms. Gold finally withdrew from CRI, advertised a 100 percent placement rate for both the court reporting day and night programs. Ex. A, Pt. 2 at 48, 95.

47. In June 2006, the Workforce Board concluded—following a "rash" of complaints—that CRI's "court reporting program is simply not adequate to achieve the objective for which it is offered." Ex. A, Pt. 3 at 33.  At that time, the Board determined that CRI had "engaged in a significant number of unfair business practices by failing to comply with the terms of a student contract (which incorporates the school's catalog by reference) [Wash. Rev. Code § 28C.10.110(1)] and making statements in connection with the offering of education that the school knew or reasonably should have known to be false, substantially inaccurate, or misleading [*id.* § 28C.10.110(10)]." *Id.*

48.     In July 2006, the Board further concluded that CRI's "statement that its program adequately prepares students for entry level employment in the Court Reporting field is not supportable given the school's single digit completion and employment rates . . . Hundreds of students have paid thousands of dollars each for a program they will never complete." Ex. A, Pt. 3 at 40.

49.     With respect to the completion rate and average program length, the Workforce Board found that, of the nearly 600 court reporting students who attended the school between July 1, 1998 and June 30, 2001—a few months before Ms. Gold herself enrolled—eleven students total had graduated. Ex. A, Pt. 2 at 231. Four of those students attended the evening program, while the remaining seven students attended the day program. *Id.* Based on these statistics, the Workforce Board found that the average length of time it took to complete the evening program was 63.25 months. *Id.* The average length of time it took to complete the day program was 52.5 months. *Id.*

50.     Given CRI's low completion rates, as well as these rates' relationship to CRI's job placement rates, the Board concluded that CRI "knew or reasonably should have known" that its 2002 course catalog—which advertised a seventy-five percent placement rate for the court reporting day program and a 100 percent placement rate for the night program—was "false, substantially inaccurate, or misleading [*id.* § 28C.10.110(10)]." Ex. A, Pt. 3 at 38.

***Investigation by the United States Department of Education***

51.     Since at least 2005, the Department has been aware of CRI's false promises about the length of its court reporting program, including the Workforce Board's specific factual findings regarding those misrepresentations.

52.     In 2003, the Department commenced a program review of CRI's campus in Seattle, Washington. Exhibit C, 2003 Department Program Review of CRI. The purpose of that

11

review was to determine whether CRI was complying with the statutory and regulatory requirements of Title IV. During that review, the Department found that CRI was improperly administering its Satisfactory Academic Progress ("SAP") policy and, as a result, enrolled students had received federal student aid beyond what should have been necessary to complete CRI's 3,000-hour court reporting program. *Id.* at 3-4.

53. The Department instructed CRI to review the files of all students who had enrolled in the court reporting program in Seattle to identify those students who had received too much federal aid. Ex. C at 4.

54. In November 2005, at the conclusion of the program review, the Department instructed CRI to "revise its school catalog and other consumer information" to make clear to its students that the school's SAP policy might result in students failing to finish the court reporting program in the allotted 3,000 hours, making them ineligible for additional federal student aid to complete their credentials. Ex. C at 11.

55. The following year, in December 2006, the Department expressly acknowledged to a group of CRI borrowers that the Workforce Board had "determined that CRI was misleading students about the amount of time it would take to complete the Court Reporting program." Exhibit D, 2006 Letter from the Department to CRI Students, at 2. The Department further acknowledged that CRI "was instructed to ensure that potential students would be given accurate information" about program requirements and the "difficulty of completing this type of program within the time allotted." *Id.*

56. Moreover, the Department admitted that it was "aware of the financial burden that the students of CRI ha[d] incurred," as well as that CRI had "misled and misguided" former students. Ex. D at 3.

57. The Department then informed this group of CRI borrowers that there were "several options" for discharging or cancelling their federal student loans. Ex. D at 3. Notably, the Department did not include on its list of options the right to assert CRI's acts and omissions as a defense to repayment. *Id.*

***Statutory and Regulatory Framework for Borrower Defense to Repayment***

58. Student loan borrowers may assert to the Department as a defense to repayment of a federal Direct Loan that the school committed an act or omission that would give rise to a cause of action against the school under state law. 34 C.F.R. § 685.206(c)(1); *see also* 20 U.S.C. § 1087e(h). If the borrower's defense against repayment is successful, the Department must notify "the borrower that the borrower is relieved of the obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay." 34 C.F.R. § 685.206(c)(2).

59. Federal regulations governing FFEL loans also dictate that "[a]ny lender holding a loan is subject to all claims and defenses that the borrower could assert against the school with respect to that loan," so long as the borrower can establish that there was a sufficiently close relationship between the school and the lender. *See* 34 C.F.R. § 682.209(g). This provision of the FFEL regulations reflects the Department's adoption of the Federal Trade Commission's Preservation of Consumers' Claims and Defenses regulation, commonly referred to as the Holder Rule. *See* 16 C.F.R. §§ 433.1-433.2.

60. Although the assertion of a borrower defense claim for a FFEL loan borrower should be made against the current holder of the loan, the Department has adopted a process whereby FFEL borrowers can first apply for borrower defense relief and, if that application is granted, the Department then notifies the borrower to apply for a Direct consolidation loan. Once the borrower has done so and his or her request for consolidation is approved, the

Department becomes the holder of the borrower's loans and can process his or her request for forgiveness.

61. Consistent with these instructions, on May 18, 2016, Ms. Gold submitted a borrower defense to repayment application to the Department requesting that the Department, with respect to loans borrowed to attend CRI:

   a. Cancel any remaining principal, interests, fees, and costs associated with her federal student loans;

   b. Cease any collection against her in relation to her federal student loans;

   c. Return any sums paid, whether voluntary or involuntarily, toward her federal student loans;

   d. Remove any adverse reports related to her federal student loans from all consumer credit reporting agencies; *and*

   e. Restore eligibility to receive funds under Title IV of the HEA.

62. As a basis for her borrower defense claim, Ms. Gold cited acts by CRI in violation of the Washington Consumer Protection Act, Chapter 19.86 of the Washington Revised Code; the Federal Trade Commission Act and its implementing regulations; Title IV of the HEA and its implementing regulations, which prohibit schools from making "substantial misrepresentations" to students; and fraudulent misrepresentation and concealment under common law.

63. A true and correct copy of the Claim is attached hereto as Exhibit E.  In the Claim, Ms. Gold states, *inter alia*, that:

   a. "The advertised length of training was misrepresented.  The school stated that typically the program was completed in 3 years or less."

   b. "I was told that there were many more graduates of the school than there were."

c. "The school was described in their brochures as a modern facility conducive to a learning environment with a 'fully equipped computer lab,' or was 'state-of-the-art.' This turned out to be very untrue as their equipment was very outdated and didn't always work.  The school said that the educators were high quality and experienced[,] but classes were either self-taught or taught by other failed or currently enrolled students who would dictate to students out of dilapidated dictation books."

d. "There was a very poor radio dictation system that was used in place of instructors."

e. "I was told that the classes offered and needed would be instructed by high quality, experienced instructors.  This was not true in any sense.  The classes were offered[,] but were of such poor quality I did not see how anyone could pass the tests required to work or to achieve employment in this field.  There were so few graduates from CRI that actually passed the State Certification exams and fewer who could actually keep a job in court reporting due to the poor training.  I was told when I first applied for the course that there were many more graduates than there were."

f. "I was told it was a 3 year program, and maybe less, and the cost of the program for the 3 years.  There was never any discussion on how much more it would cost if I did not graduate in 3 years.  I was pushed into getting living expenses and told that it would be no problem for me to pay all the loans back because in 3 years I would be making so much money.  They never explained the difference of federal and private loans[,] so I ended up signing up for both.  I did not know this until I

started to have to pay the loans back. No explanation of the difference between grants and loans were ever offered."

64. Ms. Gold further requested that the Department provide a notification of a hearing or determination of her asserted defense to repayment within thirty days.

65. To date, Ms. Gold has not received a final agency decision with respect to her Claim.

***Other Claims Submitted on Behalf of CRI Borrowers, Including Plaintiff***

66. On November 21, 2016, approximately six months after Plaintiff submitted her borrower defense claim, Bob Ferguson, the Attorney General of the State of Washington, submitted a group claim to the Department under 34 C.F.R. § 685.206(c)(1) on behalf of former CRI students (hereinafter the "AG Ferguson Request"). *See* Ex. A, Pts. 1-3. This request sought the discharge of federal student loans for all students who attended CRI's Seattle and Tacoma campuses, regardless of whether those loans were issued under the Direct or FFEL programs. Ex. A, Pt. 1 at 1-2.

67. The AG Ferguson Request asserted that CRI had engaged in a course of conduct that gave rise to state law causes of action under Washington's Consumer Protection Act, Chapter 19.86 of the Washington Revised Code, and common law fraud. The AG Ferguson Request also included a detailed recitation of the factual findings and conclusions of the Workforce Board, attached forty-five exhibits, and explained how—in the opinion of the Washington Attorney General—"[i]n a court of law, the doctrine of collateral estoppel would apply to prevent re-litigation of the [Board's] findings."

68. On December 7, 2016, United States Senator Patty Murray, who represents the state of Washington, sent a letter to then-Secretary of Education John B. King, Jr. in order to "bring your attention to the deceptive actions" of CRI. Exhibit F, 2016 Letter from Senator Patty

16

Murray to the Department. In her letter, Senator Murray specifically highlighted the AG Ferguson Request and noted that the "Workforce Board determined that CRI had engaged in unfair and deceptive business practices that violate Washington state law." *Id.* at 2. Senator Murray urged the Department to provide full and immediate relief to all former CRI students. *Id.*

69. On July 7, 2017, James F. Manning, the Acting Under Secretary of the Department, reported to Congress that "[n]o borrower defense applications ha[d] been approved between January 20, 2017, and [July 7, 2017]." According to a report issued by the Department of Education's Office of the Inspector General, only two borrower defense applications had been denied during that same period.

70. In September 2017, Mr. Manning attested that the Department was "currently in the process of adjudicating Borrower Defense discharge claims." Similarly, on November 14, 2017, at the opening session of a negotiated rulemaking, Mr. Manning stated that the Department is "working to adjudicate pending claims related to" schools other than those pertaining to Corinthian Colleges, Inc. and that "we are making progress on that front." Mr. Manning continued, however, by "admit[ting]" that the Department was "not as close" on the processing of non-Corinthian claims "as we are with the Corinthian claims."

71. On January 17, 2018, more than thirteen months after Senator Murray's letter was sent to the Department on behalf of CRI students, Mr. Manning responded in his official capacity as Acting Under Secretary. Exhibit G, 2018 Department Response to Senator Murray. In his response, Mr. Manning noted that the Department "recognized that many borrowers have waited to hear about the disposition of their claims" for debt relief, including the "specific BD claims referenced in [Senator Murray's] letter," and that the Department was "working tirelessly to reduce the number of pending claims." *Id.* at 1.

72. Upon information and belief, the Department never responded to the AG Ferguson Request.

73. Today, not a single Department employee is assigned full-time to investigate borrowers' defense to repayment applications.  Stacy Cowley, "Borrowers Face Hazy Path as Program to Forgive Student Loans Stalls Under Betsy DeVos," *New York Times* (Nov. 11, 2018), https://www.nytimes.com/2018/11/11/business/student-loans-betsy-devos.html.  Instead, the Department "has fought in court to reduce the amount of relief granted to some students and to halt a rule change intended to speed other claims along."  *Id.*  As a result, more than 100,000 claims remain in limbo.  *Id.*

***Ongoing Harm to Ms. Gold***

74. Ms. Gold has been significantly harmed by the Department's delay in processing her Claim.

75. All of Ms. Gold's loans remain on her credit report, negatively impacting her credit score due to late or missed payments.  This has impaired her ability to buy a car.

76. After Ms. Gold exhausted her eligibility to use Title IV funds to finance her education at CRI, she has been unable to pursue further higher education.  As a result, she remains in a similar secretarial role as the one she had prior to her attendance at CRI.  Ms. Gold has been unable to further her career and improve her job security or salary.

77. Because Ms. Gold has been unable to further her career, she has, at times, been unable to maintain steady employment.  Her family lives paycheck to paycheck.  As a result, Ms. Gold has been unable to save for retirement.

78. Ms. Gold has also suffered emotional harm.  She feels like a failure because she was unable to graduate from CRI.  The enormity of her student loan debt causes ongoing stress.

She often feels demoralized and defeated.  In addition, Ms. Gold regularly experiences anxiety and feelings of hopelessness.

79. Ms. Gold faces the threat of future collection activity on her student loans by the Department at any time, including the threat of collection litigation.

80. All of Ms. Gold's loans are also presumptively non-dischargeable in bankruptcy, unless she can prove an "undue hardship," which courts have interpreted in the past as an extremely high bar.

81. As a result, without adjudication of her Claim, Ms. Gold's student loans will follow her for the rest of her life.

## CAUSE OF ACTION

### Count 1
### *Unreasonably Delayed Final Agency Action – Violation of the APA, 5 U.S.C. § 706(1)*

82. Ms. Gold repeats the allegations in the foregoing paragraphs and incorporates them as though fully set forth herein.

83. The Defendants knew or should have known that Ms. Gold's Claim asserts an act or omission by CRI that would give rise to a cause of action against CRI under Washington state law.  Accordingly, Ms. Gold has asserted a valid borrower defense to repayment of her loans.

84. In addition, the Defendants knew or should have known that there were no facts in dispute in Ms. Gold's Claim because Ms. Gold's Claim fell within the factual findings of several Workforce Board decisions, to which collateral estoppel should apply.

85. For that reason, the Defendants knew or should have known that there was no lengthy investigation required to process Ms. Gold's Claim.

86. By refusing to process Ms. Gold's Claim in a reasonable amount of time, the Defendants are engaging in unreasonable delay in violation of the APA, 5 U.S.C. § 706(1).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Christine Gold respectfully requests that this Court:

    A.    Enter a declaration that the Defendants have unreasonably delayed taking final agency action on Ms. Gold's Claim, in violation of the APA;

    B.    Order the Department to issue a final agency decision on Ms. Gold's Claim within 60 days, or within a particular timeframe that the Court determines to be reasonable;

    C.    Retain jurisdiction of this matter until Defendants have fulfilled their legal and Court-ordered obligations, as set forth in this Complaint and any subsequent orders of this Court;

    D.    Award Ms. Gold reasonable fees, expenses, costs, and disbursements, including attorneys' fees associated with this litigation under the Equal Access to Justice Act, 28 U.S.C. § 2412; *and*

    E.    Grant such further relief as the Court may deem just and proper.

Respectfully Submitted,

/s/ Martha U. Fulford

Martha U. Fulford (D.C. Bar 1011954)
Robyn K. Bitner* (*pro hac vice forthcoming*)
National Student Legal Defense Network
1015 15th Street N.W., Suite 600
Washington, D.C. 20005
martha@nsldn.org
robyn@nsldn.org
(202) 734-7495

*Member of New York Bar only;
practicing in the District of Columbia
under supervision of members of the
D.C. Bar while D.C. Bar application is pending.

*Counsel for Plaintiff Christine Gold*

Dated: November 20, 2018